Receipt number 9998-5375887

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| OXY USA INC. | ) | |
| and | ) | |
| CITGO PETROLEUM CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. ___19-694 C___ |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## **COMPLAINT**

1.      Plaintiffs OXY USA Inc. and CITGO Petroleum Corporation ("Plaintiffs") bring this action for money damages against the United States of America ("United States" or "Government") for breaches of contract pursuant to the Tucker Act, the Contract Settlement Act of 1944 and the Contract Disputes Act.

2.      This action arises from three Government contracts between the United States and Plaintiffs.  Under the first contract, Plaintiffs produced substantial quantities of high-octane aviation gasoline ("Avgas") at the direction of and for the United States at Plaintiffs' oil refinery in Lake Charles, Louisiana ("Lake Charles Refinery") for the war effort during World War II ("WWII").  Under the second contract, Plaintiffs produced butadiene at the direction of and for the United States at a Government-owned defense plant known at the time as Butadiene Plancor 706, which was located near the Lake Charles Refinery, during WWII and continuing until 1955. Under the third contract, Plaintiffs provided a right-of-way easement for the conveyance and disposal of wastes generated by the Butadiene Plancor 706 at waste units at the Lake Charles

Refinery during the period of 1946 to 1955.  The performance of these contracts necessarily involved the generation and disposal of waste at the Lake Charles Refinery and other adjacent or nearby areas and waterways (collectively, the "Lake Charles Site" or "Site") that resulted in significant contamination at the Site.  Furthermore, Plaintiffs have been required to pay substantial cleanup (response) costs, and will be required to pay additional cleanup costs, pursuant to and in accordance with federal and/or state law to respond to and address this contamination at the Site, and therefore bring this action to recover those costs from the United States under these contracts.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, the Contract Settlement Act of 1944, as amended, Pub. L. No. 78-395, § 13, 58 Stat. 649, 660-61 (July 1, 1944), and the Contract Disputes Act, 41 U.S.C. § 7104.

## PARTIES

4.      Plaintiff OXY USA Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

5.      Plaintiff CITGO Petroleum Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

6.      The United States is the defendant.

## STATEMENT OF FACTS

**A.  Avgas Contract:**

7.      In the early 1940s the U.S. Reconstruction Finance Corporation ("RFC"), a predecessor-in-interest to the U.S. General Services Administration ("GSA"), established the U.S. Defense Supplies Corporation ("DSC") as a subsidiary corporation to procure critical

wartime-related commodities, and one of the primary purposes of the DSC was to enter into Avgas production contracts with individual oil refining companies for the production of Avgas for the United States and in support of the war effort.

8.      On June 16, 1942 the DSC entered into a multi-year, Avgas production contract ("Avgas Contract") with the Plaintiffs' predecessor-in-interest Cities Services Refining Corporation ("CSRC") for the production, manufacture, sale and delivery of maximum quantities of Avgas at the Lake Charles Refinery to the DSC for the war effort.  *See* Exhibit A, "Contract Between Defense Supplies Corporation and Cities Services Refining Corporation (Lake Charles Refinery) – 100-Octane Aviation Gasoline – June 16, 1942".

9.      The DSC was authorized to contractually bind the United States and enter into the Avgas Contract.

10.     The Avgas Contract expressly requires the United States to pay:

> any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller [CSRC] *may be required by any municipal, state, or federal law* in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder [i.e., Avgas].

Exhibit A at 11 (italics added).

11.     Pursuant to the Avgas Contract, Plaintiffs produced and delivered substantial quantities of Avgas for the United States at the Lake Charles Refinery during WWII.

12.     Plaintiffs' production, manufacture, sale and delivery of Avgas on behalf of the United States at the Lake Charles Refinery pursuant to the Avgas Contract necessarily involved the generation and disposal of waste at the Site that resulted in significant contamination at the Site.

13.     Under the Avgas Contract, the United States agreed to reimburse Plaintiffs for any new or additional charges that it was required to pay pursuant to federal or state law by

reason of the production, manufacture, sale or delivery of Avgas pursuant to such Avgas Contract.

14.     The Avgas Contract reflected the parties' intent that the United States would reimburse Plaintiffs for all unanticipated costs or expenses incurred as a result of the production, manufacture, sale or delivery of Avgas under the Avgas Contract, regardless of when these costs were actually incurred during the term of such contract or at any time in the future.

15.     In *Shell Oil Co. v. United States*, 751 F. 3d 1282 (Fed. Cir. 2014) ("*Shell*"), the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") confirmed that a company may recover environmental cleanup (response) costs to address historical contamination from the United States under similar clauses in wartime contracts.  In fact, the Federal Circuit held that the term "charges" in a pertinently-identical reimbursement provision in the wartime avgas contracts at issue in *Shell* encompassed "costs" and more specifically cleanup (response) costs incurred "by reason of" the performance of those avgas contracts, and therefore, the United States was liable to various oil companies for such cleanup costs incurred pursuant to such avgas contracts in the *Shell* case.  *Id.* at 1290-96.

**B.  <u>RuR Contract</u>:**

16.     In 1940 the RFC also established the U.S. Rubber Reserve Company ("RuR") as a subsidiary of the RFC; one of the primary purposes of the RuR was to enter into contracts  with private companies for the production of synthetic rubber or raw materials essential to the production of synthetic rubber, such as butadiene, butyl rubber, copolymer or styrene, that were critical war-related materials at Government-owned synthetic rubber plants.

17.     On July 3, 1942 the RuR entered into a contract with CSRC for the production of butadiene at the Government-owned defense plant known as Butadiene Plancor 706, which was

located near the Lake Charles Refinery, during WWII and subsequent years through 1955.  *See*

Exhibit B, *Contract Between RuR and CSRC* (July 3, 1942) ("RuR Contract").

18.    The RuR was authorized to contractually bind the United States and enter into the

RuR Contract.

19.    Similar to the Avgas Contract, under the RuR Contract the United States

expressly agreed to reimburse Plaintiffs for any "charges" that it was required to pay under

federal or state requirements in connection with the operation of Butadiene Plancor 706, and in

fact the RuR Contract further mandated that the United States reimburse Plaintiffs for all costs

associated with the disposal of wastes in connection with the operation of the Butadiene Plancor

706.  The RuR Contract expressly provides, in relevant part, the following:

> The purchase price to be paid to Contractor [i.e., CSRC] shall
> [incorporate] "costs" … including … (c) *[t]he amount of all* taxes,
> licenses, fees, or other *charges levied by any competent governmental*
> *authority* on the property covered by the Butadiene Lease Contract …
> including any applicable Federal, state or local taxes, assessments or
> charges … which Contractor may be required to pay and which are
> incurred in connection with the operation of the Butadiene Plant, or for the
> privilege of operating the Butadiene Plant [and] … (n) [t]he cost of
> disposing of all waste solids, liquids and gases resulting from
> manufacturing operations at the Butadiene Plant.

Exhibit B at 8, 10.

20.    Pursuant to the RuR Contract, the operation of the Butadiene Plancor 706 resulted

in the production of substantial quantities of butadiene for the United States for the war effort

and other national defense purposes.

21.    As the United States itself acknowledged in the RuR Contract, the operation of

the Butadiene Plancor 706 under the RuR Contract also necessarily involved the generation and

disposal of waste at the Site, and the disposal of this waste resulted in significant contamination

at the Site.

22.     The RuR Contract reflected the parties' intent that the United States would reimburse Plaintiffs for all unanticipated costs or expenses incurred, including specifically but not limited to all costs associated with the disposal of waste, as a result of the operation of the Butadiene Plancor 706, regardless of when these costs were actually incurred during the term of such contract or at any time in the future.

### C.  ROW Agreement

23.     Shortly after WWII ended but with the Government-owned Butadiene Plancor 706 continuing to operate under Government direction and control, the RuR retained Sheppard Powell, who was then a recognized expert in the field of industrial waste management, to conduct an industrial waste audit of many of the Government-owned synthetic rubber plants throughout the nation, including Butadiene Plancor 706.   The Government's wartime policy was not to divert funds, resources or manpower for the purpose of equipping the Government-owned plants with adequate waste processing facilities to handle the wastes generated by these plants. But after the war the RuR retained Sheppard Powell to investigate the types of wastes generated by these Government-owned plants and the inadequacy of their waste processing facilities.   In his 1946 report Sheppard Powell specifically documented the types of wastes, wastewaters and stormwater generated by the Butadiene Plancor 706 and the inadequacy of its waste processing facilities.

24.     Soon after Sheppard Powell issued his report, on December 30, 1946 the RFC and CSRC entered into an agreement under which CSRC agreed to grant an easement and right-of-way to RFC for the construction of an RFC-owned pipeline to carry wastes generated by Butadiene Plancor 706 for disposal in a waste unit – known as the "Surge Pond" – that was located at the Lake Charles Refinery.  The ROW Agreement stated that the easement was for the

express purpose of establishing a "Butadiene Plant Effluent Disposal System" and the ROW Agreement was intended to address Sheppard Powell's findings that the Butadiene Plancor 706's wastes were being poorly handled by the plant's inadequate waste processing facilities and causing significant environmental contamination.  *See* <u>Exhibit C</u>, *Right of Way Easement Agreement Between RFC and CSRC* (Dec. 30, 1946) ("ROW Agreement").

25.     The RFC was authorized to contractually bind the United States and enter into the ROW Agreement.

26.     Pursuant to the ROW Agreement, substantial amounts of toxic and hazardous wastes generated by the Butadiene Plancor 706 were disposed of into the RFC-owned pipeline, and from this pipeline these wastes escaped and were otherwise released and discharged into the Surge Pond at the Lake Charles Refinery during the period of 1947 to 1955.  As a result, these wastes caused significant contamination at the Surge Pond and other areas at the Lake Charles Site, as well as causing significant contamination of the waterways at the Site.

27.     Under the ROW Agreement, the United States expressly agreed to (1) "assume and pay all damages resulting therefrom and" (2) "indemnify" CSRC "for losses, claims, demands and suits for damages to property . . . including attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted" in connection with the use of the RFC-owned pipeline and the escape, release or discharge of Butadiene Plancor 706 waste at the Surge Pond and elsewhere that resulted in significant contamination at the Site.  The ROW Agreement expressly provides, in relevant part, the following:

> Grantee [RFC] agrees to construct and maintain said pipe line in such condition that the escape of any products transported therein shall be prevented and should the property of grantor [CSRC] or any other corporations, person or firm be injured or destroyed thereby grantee also agrees to assume and pay all damages resulting therefrom, and grantee also agrees to indemnify grantor for losses, claims, demands and suits for

damages to property and injury to or death of persons, including court costs and attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted.

Exhibit C at 2.

28.     As the United States itself fully contemplated and acknowledged by entering into the ROW Agreement, the right-of-way easement and related use of the RFC-owned pipeline resulted in the disposal of significant amounts of toxic and hazardous wastes generated by the Butadiene Plancor 706 at the Lake Charles Refinery, and the disposal of these wastes resulted in significant contamination at the Site. This contamination at the Site resulted from the escape, release or discharge of Butadiene Plancor 706 wastes at the Site that was "incident to or resulting from grantee's exercise of the right herein granted" under the ROW Agreement.

29.     The ROW Agreement reflected the parties' intent that the United States would reimburse Plaintiffs for all damages, including but not limited to cleanup costs, to address the significant contamination at the Site resulting from the disposal of Butadiene Plancor 706 wastes that resulted from or was otherwise incident to the exercise of the right-of-way easement and related use of the RFC-owned pipeline pursuant to such ROW Agreement, and that Plaintiffs were entitled to full reimbursement and indemnification for all such costs by the United States, and the costs subject to reimbursement also included attorneys' fees and court costs incurred by Plaintiffs, regardless of when these costs or fees were actually incurred during the term of such contract or at any time in the future.

**D.  Cleanups:**

30.     In order to fully address this contamination at the Site, Plaintiffs have undertaken a series of interrelated/coordinated investigation and cleanup activities at the Site, these cleanup actions are ongoing, and will continue for the foreseeable future. Plaintiffs have been required

by federal and state law to undertake these cleanup actions in response to requirements and directives from the Louisiana Department of Environmental Quality.

31.     These cleanup activities address contamination and property damage arising from wartime-related and other historical activities conducted pursuant to the Avgas Contract, RuR Contract and/or ROW Agreement.

32.     In undertaking these cleanup actions at the Site, Plaintiffs have incurred approximately $94,000,000 in response costs through December 2016, have continued to incur response costs since December 2016, and will continue to incur substantial additional response costs for the foreseeable future at the Site.

33.     On May 15, 2018, pursuant to the Contract Settlement Act of 1944, as amended, Pub. L. No. 78-395, § 13, 58 Stat. 649, 660-61 (July 1, 1944), and the Contract Disputes Act, 41 U.S.C. §§ 7101 *et seq.*, Plaintiffs submitted a certified, written demand to the GSA, as successor in interest to the contracting agencies RFC, DSC and RuR, for written findings and a decision on its three Government contract claims for reimbursement and/or indemnification of costs incurred through December 2016 for the investigation and cleanup activities conducted to address this contamination at the Site attributable to the performance of the Avgas Contract, RuR Contract and ROW Agreement ("Plaintiffs' Written Demand").  *See* <u>Exhibit D</u>, Plaintiff's Written Demand dated May 15, 2018 (w/o exhibits).

34.     On March 19, 2019, the GSA denied the claims made in Plaintiffs' Written Demand, and, thus, Plaintiffs have exhausted their administrative remedies and may bring this action pursuant to the Contract Settlement Act of 1944, as amended, Pub. L. No. 78-395, § 13, 58 Stat. 649, 660-61 (July 1, 1944), and the Contract Disputes Act, 41 U.S.C. § 7104.  *See* Exhibit E, GSA's Denial Letter dated March 19, 2019.

## COUNT I

**(Avgas Contract: Breach of Contract Claim Pursuant to the Contract Settlement Act of 1944)**

35.     Paragraphs 1-34 are restated and re-alleged as though fully set forth herein.

36.     Plaintiffs have been required to pay, and will continue to be required to pay, for substantial response costs pursuant to federal and/or state law by reason of the production, manufacture, sale and delivery of Avgas pursuant to the Avgas Contract, and have incurred and will continue to incur other reimbursable costs and expenses, including but not limited to legal expenses such as attorney's fees related to this claim.

37.     In accordance with the requirements and directives from the Louisiana Department of Environmental Quality pursuant to federal and state law, Plaintiffs have incurred approximately $94,000,000 in response costs through December 2016 to undertake cleanup actions at the Site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq*., Louisiana Environmental Quality Act, as amended, La. Rev. Stat. Ann. § 30.2276A, and/or other relevant federal and state authorities. These response costs constitute new or additional charges that Plaintiffs were required to pay under federal and/or state law by reason of the production, manufacture, sale or delivery of Avgas pursuant to the Avgas Contract.  As such, the United States is required to pay and/or reimburse Plaintiffs for a portion of these costs under the Avgas Contract.

38.     In accordance with the requirements and directives from the Louisiana Department of Environmental Quality pursuant to federal and state law, Plaintiffs have continued to incur response costs since December 2016, and will be required to incur additional response costs for the foreseeable future to undertake cleanup actions at the Site.   These ongoing and future response costs constitute new or additional charges that Plaintiffs are required to pay under federal and state law by reason of the production, manufacture, sale or delivery of Avgas pursuant to the Avgas Contract.   As such, the United States is required to pay and/or reimburse Plaintiffs for a portion of these ongoing and future costs under the Avgas Contract.

39.     The United States' refusal to pay and/or reimburse Plaintiffs for the costs described in Paragraphs 32, 37 and 38 materially breaches the Avgas Contract.   As a result of the United States' breach of contract, Plaintiffs are entitled to recover the full amount of such costs by reason of the United States' failure to adhere to its obligation to pay and/or reimburse Plaintiffs for these costs pursuant to the Avgas Contract.   Moreover, the United States' breach of the Avgas Contract entitles Plaintiffs to damages and other monetary relief.

## COUNT II

### (Failure to Provide Fair and Speedy Compensation Under the Contract Settlement Act of 1944 With Respect to the Avgas Contract)

40.     Paragraphs 1-39 are restated and re-alleged as though fully set forth herein.

41.     The United States' failure to consider Plaintiffs' claim for payment and/or reimbursement of the costs described in Paragraphs 32, 37 and 38 of this Complaint with respect to the Avgas Contract constitutes a failure to provide speedy and fair compensation in violation of the Contract Settlement Act of 1944, as amended, Pub. L. No. 78-395, §§ 6(a) and 6(f), 58 Stat. 649, 652-54 (July 1, 1944), for which Plaintiffs are entitled to payment of "fair compensation," together with interest.   *Id.*

<u>**COUNT III**</u>

**(RuR Contract: Breach of Contract Claim Pursuant to the Contract Settlement Act of 1944)**

42.     Paragraphs 1-41 are restated and re-alleged as though fully set forth herein.

43.     Plaintiffs have been required to pay, and will continue to be required to pay, for substantial response costs under federal and/or state requirements in connection with the operation of the Butadiene Plancor 706 pursuant to the RuR Contract, and have incurred and will continue to incur other reimbursable costs and expenses, including but not limited to legal expenses such as attorney's fees related to this claim.

44.     Plaintiffs have paid, and will continue to pay, for substantial response costs in connection with disposing of all waste solids, liquids and gases resulting from the manufacturing operations of the Butadiene Plancor 706 pursuant to the RuR Contract, and have incurred and will continue to incur other reimbursable costs and expenses, including but not limited to legal expenses such as attorney's fees related to this claim.

45.     In accordance with the requirements and directives from the Louisiana Department of Environmental Quality pursuant to federal and state law, Plaintiffs have incurred approximately $94,000,000 in response costs through December 2016 to undertake cleanup actions at the Site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq*., Louisiana Environmental Quality Act, as amended, La. Rev. Stat. Ann. § 30.2276A, and/or other relevant federal and state authorities. These response costs constitute charges that Plaintiffs were required to pay under federal and/or state requirements in connection with the operation of the Butadiene Plancor 706, and also specifically include but are not limited to the cost of disposing of all waste solids, liquids and gases resulting from the manufacturing operations of the Butadiene Plancor 706.  As such, the

United States is required to pay and/or reimburse Plaintiffs for a portion of these costs under the RuR Contract.

46.    In accordance with the requirements and directives from the Louisiana Department of Environmental Quality pursuant to federal and state law, Plaintiffs have continued to incur response costs since December 2016, and will be required to incur additional response costs for the foreseeable future to undertake cleanup actions at the Site.  These ongoing and future response costs constitute charges that Plaintiffs are required to pay under federal and/or state requirements in connection with the operation of the Butadiene Plancor 706, and also specifically include but are not limited to the cost of disposing of all waste solids, liquids and gases resulting from the manufacturing operations of the Butadiene Plancor 706.  As such, the United States is required to pay and/or reimburse Plaintiffs for a portion of these ongoing and future costs under the RuR Contract.

47.    The United States' refusal to pay and/or reimburse Plaintiffs for the costs described in Paragraphs 32, 45 and 46 materially breaches the RuR Contract.  As a result of the United States' breach of contract, Plaintiffs are entitled to recover the full amount of such costs by reason of the United States' failure to adhere to its obligation to pay and/or reimburse Plaintiffs for these costs pursuant to the RuR Contract.  Moreover, the United States' breach of the RuR Contract entitles Plaintiffs to damages and other monetary relief.

## <u>COUNT IV</u>

**(Failure to Provide Fair and Speedy Compensation Under the Contract Settlement Act of 1944 with Respect to the RuR Contract)**

48.    Paragraphs 1-47 are restated and re-alleged as though fully set forth herein.

49.    The United States' failure to consider Plaintiffs' claim for payment and/or reimbursement of the costs described in Paragraphs 32, 45 and 46 of this Complaint with respect

to the RuR Contract constitutes a failure to provide speedy and fair compensation in violation of the Contract Settlement Act of 1944, as amended, Pub. L. No. 78-395, §§ 6(a) and 6(f), 58 Stat. 649, 652-54 (July 1, 1944), for which Plaintiffs are entitled to payment of "fair compensation," together with interest.  *Id.*

## COUNT V

### (ROW Agreement: Breach of Contract Claim Pursuant to the Contract Disputes Act)

50.    Paragraphs 1-49 are restated and re-alleged as though fully set forth herein.

51.    Plaintiffs have incurred and will continue to incur substantial damages and losses, have been and will continue to be subject to claims and demands, and have paid and will continue to pay significant attorney's fees and court costs, resulting from the escape, release or discharge of Butadiene Plancor 706 wastes at the Site that was "incident to or resulting from grantee's exercise of the rights herein granted" under the ROW Agreement.

52.    Plaintiffs have incurred significant damages and losses because Plaintiffs have been required to pay for, and will continue to be required to pay for, substantial cleanup (response) costs to address the significant contamination at the Site.

53.    Plaintiffs have been subject to claims and demands because the Louisiana Department of Environmental Quality has issued directives that demand or otherwise require Plaintiffs to conduct and pay for cleanup (response) actions to address the significant contamination at the Site that has resulted in significant property damage at the Site.

54.    In accordance with the requirements and directives from the Louisiana Department of Environmental Quality pursuant to federal and state law, Plaintiffs have incurred approximately $94,000,000 in response costs through December 2016 to undertake cleanup actions to address the contamination at the Site, have continued to incur additional response costs

since December 2016, and will continue to incur substantial additional response costs for the foreseeable future at the Site.

55.     Plaintiffs have incurred, and will continue to incur, significant attorney's fees and court costs, to enforce the reimbursement and indemnification provision under the ROW Agreement.

56.     The United States' refusal to pay and/or reimburse Plaintiffs for the substantial damages, costs, losses, attorney's fees and other costs described in Paragraphs 32, and 51 through 55 materially breaches the ROW Agreement.  As a result of the United States' breach of contract, Plaintiffs are entitled to recover the full amount of such damages, costs, losses, attorney's fees and other costs by reason of the United States' failure to adhere to its obligation to reimburse and otherwise indemnify Plaintiffs for such damages, costs, losses, attorney's fees and other costs pursuant to the ROW Agreement.  Moreover, the United States' breach of the ROW Agreement entitles Plaintiffs to damages and other monetary relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court:

a.      Award Plaintiffs damages to be determined at trial, together with prejudgment interest, resulting from the United States' breaches of contract under the respective Avgas Contract, RuR Contract and ROW Agreement;

b.      Award Plaintiffs' reasonable accounting, legal, clerical and other costs and expenses incident to termination and attempted settlement of their claims under the Avgas Contract and the RuR Contract;

c.      Award Plaintiffs full reimbursement of their attorney's fees and court costs associated with their breach of contract claim under the ROW Agreement;

d.      Award Plaintiffs their costs, interest, and attorneys' fees as permitted by law; and

e.      Order any such other relief as the Court may deem just and proper.

Dated:  May 10, 2019                    Respectfully submitted,

s/Stephen Fitzgerald
Stephen E. Fitzgerald
stephen.fitzgerald@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue Suite 900
Dallas, TX 75201-2980
Tel.:    (214) 953-6624
Fax:    (214) 661-4624

*Of Counsel:*

Daniel M. Steinway
daniel.steinway@bakerbotts.com
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Tel.:    (202) 639-7902

Fax:     (202) 585-1003


Christopher D. Danley
christopher.danley@bakerbotts.com
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Tel.:    (202) 639-7842
Fax:     (202) 585-1049


*Counsel for Plaintiffs*